Timothy **MANEELY,** on behalf of himself and all others similarly situated, Plaintiff,

v.

**CITY OF NEWBURGH,** et al., Defendants.

No. 01 CIV. 2600(CM).

United States District Court, S.D. New York.

April 8, 2003.

See also 208 F.R.D. 69.

James Edward Monroe, Dupee, Dupee & Monroe, P.C., Goshen, NY, for Timothy S. Maneely, Individually and on behalf of all others similarly situated, David P. Leroy, Edward Jazwinski, Christina A. Loucks, plaintiffs.

David Merrill Posner, McCabe & Mack, LLP, Poughkeepsie, NY, Marilyn D. Berson, Corporation Counsel, Newburgh, Patrick T. Burke, Burke, Miele & Golden, Goshen, NY, James M. Fedorchak, Gellert & Cutler, P.C., Poughkeepsie, NY, for the City of Newburgh, the City of Newburgh, The City of Newburgh Police Department, William Bloom, Chief of Police for the City of Newburgh Police Department, defendants.

## MEMORANDUM ORDER AND DECISION DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Timothy Maneely represents a class of individuals suing the City of Newburgh and its police chief, William Bloom, pursuant to 42 U.S.C. § 1983 ("Section 1983"). Before me is plaintiffs' motion for summary judgment as to whether the City of Newburgh maintained an unconstitutional policy of strip searching all prearraignment prisoners, with or without having reasonable suspicion to believe that those persons were carrying or concealing weapons or contraband.

For the following reasons, plaintiffs' motion is denied.

### BACKGROUND

On June 4, 2000, City of Newburgh police officers arrested Timothy Maneely, brought him to the City of Newburgh Police Department, and charged him with (1) obstructing governmental administration in the second degree (a Class A misdemeanor); (2) leaving the scene of an accident (a Class B misdemeanor); and (3) harassment in the second degree (a noncriminal offense). At the police station, City of Newburgh police officers strip searched Maneely: they ordered him to remove his clothes and to bend over and squat, revealing his sexual organs and anal cavity for visual inspection.

At the same time, the City of Newburgh was involved in litigation over somewhat similar events. In 1995, City of Newburgh police officers arrested Cara Huck and made her strip to her underwear and lift her bra to expose her breasts.[1] Huck sued the City of Newburgh and one of its police officers for unlawful arrest (pursuant to Section 1983), false imprisonment, malicious prosecution, defamation, and infliction of emotional harm. The suit went to trial in state supreme court, and the court dismissed all of plaintiff's claims after both parties finished presenting their cases to the jury and rested.

However, the court allowed Huck to amend her pleadings to allege an illegal strip search claim under Section 1983. Both parties were then allowed to call additional witnesses, after which Huck made a motion for a directed verdict. The court denied Huck's motion, and the case went to the jury. The jury found that defendants had not strip searched Huck, at least as the court defined "strip search" in its instructions to the jury.

In a decision dated August 14, 2000, the Appellate Division (Second Department) reversed. After noting that "[s]trip searches of arrestees charged with misdemeanors or other minor offenses violate the Fourth Amendment to the United States Constitution unless there is a reasonable suspicion that the arrestee is concealing weapons or contraband based on the crime charged, and the circumstances of the arrest," the court ruled:

> In the instant case, the plaintiff was arrested for possessing an unlicensed dog, a violation of the City of Newburgh Code. Upon her arrest, she was taken to the police station where a matron searched her. A witness for the City of Newburgh testified that the plaintiff was asked to remove all her outer garments, and while her underwear was still on, she was asked to lift her bra and expose her breasts. The search was made pursuant to an official policy that provided for the strip-search of all arrestees detained in a cell. The record further indicates that neither the arresting officer nor the matron suspected that the plaintiff possessed any weapons or other contraband. Thus, the search was unreasonable and in violation of the plaintiff's Fourth Amendment rights, and the City of Newburgh is liable under 42 U.S.C § 1983. Therefore, the Supreme Court erred in denying the plaintiff's motion for a judgment as a matter of law against he City.

*Huck v. City of Newburgh,* 275 A.D.2d 343, 344–45, 712 N.Y.S.2d 149, 150–51 (2d Dep't 2000).

Shortly thereafter, on August 18, 2000, Maneely filed a notice of claim with the Newburgh City Clerk, alleging that he was unlawfully strip searched on June 4, 2000. Plaintiff filed a Complaint in this Court on March 27, 2001, bringing suit pursuant to 42 U.S.C. § 1983 against the City of Newburgh, the City of Newburgh Police Department, and several city employees and officials. The Complaint alleged that defendants violated the United States Constitution by maintaining a policy of strip searching all pre-arraignment prisoners without reasonable suspicion.

Beginning on August 24, the Newburgh Police Department began to take steps to change, or at least refine, its strip search policies. First, Deputy Chief Patrick Sorrentino sent an email to all sworn personnel in which he explained that a police

---

1. Huck claimed that she was made to take off all of her clothes. For purposes of this mo- tion, I accept the City's account.

officer may not conduct a strip search or body cavity search absent reasonable suspicion. Two memoranda—dated October 2, 2000 and August 23, 2001, and written by Sorrentino with input from Officer Bloom—followed the email. The memoranda (the second of which rescinded the first) reiterated the need to find reasonable suspicion before strip-searching an arrestee and set forth in greater detail how an officer was to determine whether reasonable suspicion existed. Defendants allege that they took these steps in response to the Appellate Division's decision in *Huck v. Newburgh,* not in response to Maneely's notice of claim.

In October of 2001, Maneely simultaneously moved for class certification and summary judgment, and I agreed to defendants' request that I defer ruling on plaintiff's summary judgment motion until I decided his motion for class certification. Meanwhile, the parties stipulated to a discontinuance of the suit as against all parties except the City of Newburgh and Officer Bloom.

In a May 16, 2002 decision, I granted partial class certification. I certified a class consisting of all individuals who were strip searched before arraignment between March 27, 1998 and March 27, 2001. *Maneely v. City of Newburgh,* 208 F.R.D. 69 (S.D.N.Y.2002). I certified the class for the sole purpose of ascertaining whether the City of Newburgh maintained a policy of strip searching all pre-arraignment prisoners—those for whom there was reasonable suspicion and those for whom there was not. The class certificate was limited to the constitutional issue; individual class members would then have to litigate the presence or absence of reasonable suspicion in their particular case, as well as their individual claims for damages.

Plaintiffs now argue that the Appellate Division's decision in *Huck v. Newburgh*

collaterally estops defendants from litigating whether they had a blanket policy of strip searching pre-arraignment detainees. Alternatively, they argue that the City of Newburgh's policy, in effect between September 21, 1982 and August 24, 2000, was unconstitutional on its face.

Defendants contest both of these assertions. They also argue that genuine issues of material fact exist as to whether reasonable suspicion existed for the City of Newburgh police officers to strip search Maneely.

Plaintiffs concede that if *Huck v. Newburgh* does not collaterally estop defendants and the pre-August 24 policy was not facially unconstitutional, then genuine issues of material fact exist as to whether the City of Newburgh had a policy of strip searching pre-arraignment detainees without determining whether reasonable suspicion existed to do so.

## DISCUSSION

As a preliminary matter, I note that defendants' argument that reasonable suspicion existed to support the strip search of Maneely is misplaced in this motion for summary judgment. Circumstances may have existed that would have supported a finding of reasonable suspicion in that instance. But the relevant question, and the issue for which I certified a class, is whether the City of Newburgh police had a policy of determining whether reasonable suspicion existed before they strip searched pre-arraignment detainees. In other words, even though circumstances could have existed in a particular instance (e.g., the strip search of Maneely) that would have supported a finding of reasonable suspicion, that does not answer the question of whether defendants maintained an unconstitutional blanket strip search policy during the class period.

I therefore turn to the parties' additional, dispositive arguments.

### I. The State Court's Decision Does Not Collaterally Estop Defendants' Claims

 Pursuant to 28 U.S.C. § 1738, a federal court must give a New York state court judgment the same preclusive effect that the courts of the state of New York would give it. *See Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996). Under New York law, the doctrine of collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised against that party or those in privity, whether or not the tribunals or causes of action are the same." *Ryan v. New York Telephone Co.*, 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487, 490 (1984).

 There are two requirements that must be satisfied before the doctrine applies: (1) "the identical issue necessarily must have been decided in the prior action and be decisive of the present action"; and (2) "the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Juan C. v. Cortines*, 89 N.Y.2d 659, 667, 657 N.Y.S.2d 581, 585, 679 N.E.2d 1061 (1997) (quoting *Kaufman v. Lilly & Co.*, 65 N.Y.2d 449, 492 N.Y.S.2d 584, 587, 482 N.E.2d 63, 67 (1985)); *see also Johnson v. Watkins*, 101 F.3d 792, 794–95 (2d Cir.1996) (setting forth elements of collateral estoppel under New York law). In addition, "[t]he party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues in the present litigation and the prior determination, whereas the party attempting to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action." *Kaufman v. Lilly & Co.*, 492 N.Y.S.2d at 587, 482 N.E.2d at 67.

The "issue," of course, is whether the City of Newburgh had a policy of strip searching pre-arraignment detainees without a finding of reasonable suspicion. It is clear that this issue was material to the first action and essential to the Appellate Division's decision: the court ruled that the City of Newburgh police had an "official policy that provided for the strip-search of all arrestees detained in a cell." *Huck v. City of Newburgh*, 275 A.D.2d at 344–45, 712 N.Y.S.2d at 151.

It is also precisely the issue to be determined in the present action.

The matron made Huck strip to her underwear and lift her bra. Maneely was required to take off all of his clothes and then bend over and squat. Defendants contend that the issues are not identical because Maneely's search was a body cavity search and Huck's was not—meaning that a search as intrusive as Huck's did not require reasonable suspicion.

Newburgh's argument does not make sense in the context of this motion. It contends that Huck's search was less intrusive than Maneely's. But the Appellate Division explicitly ruled that the search of Huck was sufficiently intrusive to require reasonable suspicion and that the City of Newburgh had a policy of conducting searches in the absence of reasonable suspicion. For purposes of collateral estoppel, the correctness of the prior determination is largely irrelevant. In other words:

> By foregoing the opportunity to reexamine an issue, a degree of certainty about the correctness of the prior result is sacrificed, that is to say, the bar of collateral estoppel carries with it the devastating danger that the first decision on an issue may have been wrong and will remain unremedied. Use of the doctrine represents an informed choice

that the occasional permanent encapsulation of a wrong result is a price worth paying to promote the worthy goals of ending disputes and avoiding repetitive litigation.

*Johnson v. Watkins*, 101 F.3d at 795 (internal citations omitted). A court's previous determination that the search conducted on Huck required a finding of reasonable suspicion (regardless of the merits of that finding under controlling Fourth Amendment precedent) necessarily means that the more intrusive search conducted on Maneely required reasonable suspicion. Thus, the issues are identical for collateral estoppel purposes.

That does not end the matter, however: Recognizing that the doctrine places termination of litigation ahead of the correct result, the application of collateral estoppel has been narrowly tailored to ensure that it applies only where the circumstances indicate the issue estopped from further consideration was thoroughly explored in the prior proceeding, and that the resulting judgment thus has some indicia of correctness.

*Id.* In other words, collateral estoppel does not apply if defendants can show that they did not have a full and fair opportunity to litigate the issue in *Huck v. Newburgh.* See, e.g., *Ryan v. New York Telephone Co.,* 62 N.Y.2d at 500, 478 N.Y.S.2d 823, 467 N.E.2d at 490.

■ In making this determination, a court must bear in mind the "realities of litigation." *Johnson,* 101 F.3d at 795. The factors that a court should consider include "the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation." *Schwartz v. Public Administrator of*

*Bronx County,* 24 N.Y.2d 65, 72, 298 N.Y.S.2d 955, 246 N.E.2d 725, 729 (1969). Overall, the question "cannot be reduced to a formula." *Gilberg v. Barbieri,* 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 423 N.E.2d 807, 809 (1981).

Several factors counsel finding that defendants did not have a full and fair opportunity to litigate the issue in state court. *Huck* was a lawsuit brought by one person; Maneely purports to represent a class. There is no evidence suggesting that either the Huck defendants or the state court judge was aware that a finding in plaintiff's favor might later be used to conclusively establish liability in a federal class action. See *Gilberg,* 53 N.Y.2d at 293, 441 N.Y.S.2d 49, 423 N.E.2d at 810. The defendant did not choose to litigate the matter in state court; it was the plaintiff who had the initiative. *Id.* And while nothing in the record indicates that defense counsel in *Huck* was incompetent, defense counsel in this action have considerable experience litigating strip search cases of this sort.

Most importantly, however, the issue of an unconstitutional strip search policy at the City of Newburgh police department only developed relatively late in the state court proceedings. The first count in Huck's complaint alleged that defendants deprived her of rights guaranteed under the United States Constitution in violation of Section 1983. The facts alleged in the first count do not include defendants' strip search of Huck. Indeed, the complaint makes no mention of the strip search. [Record on Appeal 19].

Approximately a year after plaintiff filed her complaint, defendants demanded a bill of particulars that asked Huck to specify (1) how her civil rights were violated as alleged in the complaint, (2) the acts that she claimed would prove that the City had

a pattern or practice that violated her civil rights, and (3) the pattern or practice that plaintiff claimed was in violation of her civil rights. *Id.* at 38. Huck's response to those requests made no mention of the strip search. Rather, she mentioned the strip search in response to defendants' demand for information about the nature of Huck's intentional infliction of emotional distress claim. *Id.* at 41.

So it seems that at the beginning of the *Huck* trial, on November 25, 1998, defendants had no indication that plaintiff planned to prove that the City of Newburgh had an unconstitutional strip search policy. Indeed, defendant's attorney stated in his opening statement: "[Huck] was never fingerprinted, never photographed, he [Officer Lopez] never conducted any strip search where she was stripped naked or any of this stuff, that's absolutely absurd. She admits herself she was never stripped naked, absolutely absurd. There's not even a claim in this case either, they never claimed that in this lawsuit." [Tr. 31–32].

The issue seems to have come to the forefront upon Chief Bloom's testimony, on December 1, which went as follows:

Question: Chief Bloom, do you know what the policy was of your department back on August 1st, 1995 concerning the strip search of detainees?

Defense Counsel: Just note my objection in that there's no claim for any strip search.

Court: Overruled.

Question: Chief?

Answer: Would you repeat that, please?

Question: I'll rephrase it, maybe you can understand it better. Tell the jury what your department's policy was on August 1st, 1995 concerning the strip searching of detainees?

Answer: If you are arrested and are going to be placed in a cell you would be strip searched prior to being placed in the cell.

Question: How about those detainees who were not placed in a cell, are they strip searched?

Answer: No, they're not.

Question: Now, is there any difference between someone, a detainee, who has been arrested for a felony vs. a misdemeanor as to how this policy was applied back on August 1st, 1995 to now?

Answer: Absolutely not.

Question: How about is there a difference in the policy of—concerning the strip search of detainees between those people who are arrested for a city code violation than, perhaps, a misdemeanor

Answer: No, there is not.

Question: Are all of these individuals who are brought in treated the same?

Answer: If they're going to be committed to a cell, yes, they are.

[Record on Appeal 330–31].

Two days later, in mid-trial, plaintiff moved pursuant to C.P.L.R. § 3025 to amend her pleadings to include allegations of an unconstitutional strip search, as set forth in a proposed "amended and supplemental bill of particulars." *Id.* at 504. Later that day, the plaintiff rested, followed immediately by the defendant. *Id.* at 531–32. And after substantial debate, the court granted plaintiff's motion and allowed plaintiff to amend her complaint to:

conform to the cause and allegations enumerated in the amended and supplemental bill particulars; that is to say, adding a specified cause of action that the defendants—the plaintiff's civil rights under 42 U.S.Code 1983 as given to her by the 4th, 5th, 9th and 14th amendments to the United States Con-

stitution were violated by the defendants in that a strip search was conducted without probable cause or reasonable suspicion to believe any contraband or dangerous objects or weapons or materials would thereby be found. And it was, therefore, an unreasonable search in violation of the 4th and 14th amendments. [Record on Appeal 50, 559, 581]. There was no adjournment for discovery, but both parties were then allowed to call more witnesses, which they did on December 4. The court charged the jurors on December 7, and they reached a verdict in defendant's favor that same day.

■ New York courts permit the offensive use of collateral estoppel.[2] *See, e.g., Koch v. Consolidated Edison Co.,* 62 N.Y.2d 548, 479 N.Y.S.2d 163, 468 N.E.2d 1 (1984). Taking into account the "realities of litigation," however, I find that the court's decision to allow Huck to amend her complaint after both parties had finished presenting their cases to the jury prevented defendants from having a full and fair opportunity to litigate the issue of whether the City of Newburgh had an unconstitutional strip search policy. Although defendants were allowed to call additional witnesses, they were unable to conduct discovery related to this issue or otherwise sufficiently prepare their case.[3]

## II. The Police Department's Written Strip Search Policy Is Not Unconstitutional On Its Face

■ As noted above, I certified a class only on the issue of whether the City of Newburgh had a policy of strip searching pre-trail detainees without making a finding of reasonable suspicion, and that is the only issue that is properly before me on this motion for summary judgment. The issue is essential to plaintiffs' suit because, where a plaintiff seeks to hold a municipality liable under Section 1983 (as plaintiffs seek to do here), he must prove that a municipal "policy" or "custom" caused the deprivation of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ A policy or custom can be established in a number of ways. First, a policy

---

2. Offensive collateral estoppel occurs when a plaintiff seeks to estop a defendant from relitigating the issues that the defendant previously litigated and lost against another plaintiff, while defensive estoppel occurs when a plaintiff is estopped from asserting a claim he had previously litigated and lost against another defendant. Although New York courts permit the use of offensive collateral estoppel, the Court of Appeals has cautioned that in certain contexts the application of the doctrine may raise legitimate fairness concerns. *See Halyalkar v. New York Board of Regents,* 72 N.Y.2d 261, 270, 532 N.Y.S.2d 85, 90, 527 N.E.2d 1222 (1988); *cf. Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 329–31, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("[Where] the application of offensive estoppel [under federal law] would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.").

3. Defendants' counsel clearly thought this to be the case, stating: "Certainly we had a right to additional depositions . . . , we could have hired experts with regard to the strip search, we could have brought in other witnesses regarding the strip search; we're now sandbagged at the last second with an alleged claim of violation of constitutional rights based on a strip search, when strip search has never been mentioned in this case in any pleading or in the bill of particulars, and I say that if that's not prejudicial nothing is." [Record on Review 563–64]. Defendants' counsel also argued to the court that only two questions were asked about strip searches in the entirety of the depositions taken for the case. *Id.* at 667.

exists where the action that is alleged to be unconstitutional (here the strip searches) "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018. Second, a municipal policy or custom may be shown by "persistent and widespread" constitutional violations that are so pervasive that policy makers may be presumed to have acquiesced to that practice. *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870–71 (2d Cir.1992). Third, a custom or policy may be shown by " 'circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *DeCarlo v. Fry*, 141 F.3d 56, 61–62 (2d Cir.1998) (quoting *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir.1991)). And fourth, actions taken by persons whose activities reflect official policy may constitute a custom or policy for Section 1983 purposes. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

In this motion, plaintiffs argue that City of Newburgh Police Officers were implementing an explicit, written police department policy when they strip searched detainees without making a finding of reasonable suspicion.[4] The regulation at issue provides:

> Before being placed in a cell and as soon as possible at headquarters after arrest, the clothing and person of a prisoner shall be thoroughly searched by the arresting officer. Strip searches will be conducted only when the arresting officer reasonably believes that the prisoner may have concealed weapons or contraband, and only after receiving explicit approval from the watch commander to conduct the strip search.

[Defendants' 56.1 Statement, Ex. C].

■■■■■■ Under Second Circuit precedent, blanket policies subjecting all newly-arrested misdemeanor detainees in a local correctional facility to visual body cavity searches are unconstitutional. *Shain v. Ellison*, 273 F.3d 56, 64–65 (2d Cir.2001); *Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir.1994); *Walsh v. Franco*, 849 F.2d 66 (2d Cir.1988); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir.1986). In order for a visual body cavity search to be found reasonable under the circumstances, there must be some " 'particularized suspicion,' arising either from the nature of the charge or specific circumstances relating to the arrestee and/or the arrest," that the arrestee is concealing weapons or other contraband. *Weber*, 804 F.2d at 802 (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 540, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)). In addition, as this Court recently concluded, the law of this Circuit requires that the "individualized reasonable suspicion" rule apply to accused felons as well as misdemeanants upon arrival at a local correctional facility. *See Murcia v. County of Orange*, 226 F.Supp.2d 489, 494 (S.D.N.Y.2002).

■■■■■ With this standard in mind, I cannot conclude that the City of Newburgh's

---

4. Of course, even if I accepted their argument, plaintiffs would still have to prove that defendants acted pursuant to that policy. In other words, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

That issue, however, is outside the scope of the issue for which I certified a class. And each plaintiff will have to litigate it individually, just as they will have to litigate (assuming that the class prevails on the "policy" issue) whether their rights were violated and whether they suffered damages. *See Maneely*, 208 F.R.D. at 79.

policy is unconstitutional on its face. Plaintiffs fail to demonstrate that the written policy "could never be applied" in a constitutional manner. *New York State Nat. Organization for Women v. Pataki*, 261 F.3d 156, 171 (2d Cir.2001). Of course, "reasonably believes" is a broader standard than "reasonable under the circumstances" pursuant to finding some "particularized suspicion." Thus, there are situations where an officer may "reasonably believe" that an arrestee is concealing weapons or other contraband, but where there exists no "particularized suspicion" under the circumstances. It is possible, however, that in implementing the "reasonable belief" standard the City of Newburgh stayed within the narrower parameters of the "particularized suspicion" standard. In other words, the City of Newburgh's policy *could* have been applied in a constitutional manner. Whether it was is an issue for the jury.

**III. Genuine Issues of Material Fact Exist as to Whether the City of Newburgh Instituted An Unconstitutional Strip Search Policy**

 Plaintiffs offer the affidavits of several individuals in which they state that City of Newburgh police officers subjected them to visual body cavity searches upon being arrested. Defendants provide (1) the deposition testimony of Chief Bloom in which he states that he was "wrong" when he testified at the Huck trial; and (2) the deposition testimony of Deputy Chief Sorrentino, in which he stated that officers were required to have reasonable suspicion in order to conduct a search in which they removed all of an arrestees' clothing. This conflicting evidence creates a genuine issue of material fact.

**IV. Defendants' Motion to Redefine the Class is Granted**

The class that I certified in my May 16, 2002 decision includes individuals who were strip searched upon their arrest between March 27, 1998 and March 27, 2001. In their papers on this motion for summary judgment, defendants ask the court to redefine the class period to run from March 27, 1998 to August 24, 2000, when defendants took steps to ensure that their policy would accord with the Fourth Amendment.

Plaintiffs do not appear to oppose this motion. Indeed, in their 56.1 Statement they assert that "[p]rior to August 24, 2000 defendants maintained a blanket policy/practice of strip-searching all pre-trial detainees upon placing them in a holding cell without regard to the existence or non-existence of reasonable suspicion." Thus, defendants' motion is granted.

CONCLUSION

Plaintiffs' motion for summary judgment is denied. Defendants' motion to redefine the class period to run from March 27, 1998 to August 24, 2000 is granted.

This constitutes the decision of the Court.